WINFIELD S. GORDON ET AL. *v.* MARY E. JAMES ET AL.

86    719
d92      8

1. WILLS. *Renunciation by widow. Effect. Code* 1892, § 4496.

Under Code 1892, § 4496, authorizing the widow to renounce the provision made for her in her husband's will, and to thereupon take such part of his estate as she would have been entitled to had he died intestate, the estate does not, on the widow's election to take against the will, become intestate as to the widow's share, so as to incumber that share primarily with the debts of the estate, but the widow is entitled to the same proportion of the estate which she would have taken had her husband died intestate, after the payment of the debts from the whole estate.

2. SAME. *Code* 1892, § 4499.

Where a widow has elected to take against her husband's will, pursuant to Code 1892, § 4496, she becomes a co-tenant with the devisee in each and every parcel of real estate specifically devised by her deceased husband, and is not made a creditor of the estate by Code 1892, § 4499, providing that, in case the widow has a separate property equal to what would be her lawful portion of her husband's estate, she may not elect to take against the will, but if her separate property be not equal in value to her portion of her husband's estate, she may signify her dissent to the will, and "claim to have the deficiency made up to her notwithstanding the will," and shall be awarded a specified proportion of "her lawful portion of the lands" and her "distributive share of the personalty."

3. ADMINISTRATION. *Assets. Rents. Crops. Code* 1892, §§ 1881, 1892.

Under Code 1892, § 1881, providing that the goods and chattels of decedent and the rent of lands accruing during the year of his death, whether he died testate or intestate, shall be assets; and § 1882, providing that the court may, on the application of the personal representative, decree the sale of the crop growing at the time of decedent's death; and § 1892, authorizing the personal representative to sell the cotton raised on the farm of deceased, or any other commodity raised for market, and to account for the proceeds as assets—rents accruing during the year of testator's death, and crops remaining on the lands at the date of his death, whether gathered or still in the field, matured or unmatured, are assets of decedent, whether testate or intestate, and as such pass into the hands of his personal representative for the payment of his debts and expenses of administration.

4. CONSTRUCTION. *Code* 1892, §§ 1881, 1882, 1892.

A provision of a will devising a plantation that in case testator's death should occur before January 1, 1901, then the rents due from the plantation for the year 1900 should be paid to his executor, did not, where testator survived January 1, 1901, indicate that the rents accruing during the year of testator's death and the crops grown on the land should not pass to the executor in accordance with Code 1892, § § 1881, 1882, 1892.

5. SAME. *Shares of stock. Dividends.*

A specific bequest of stocks and bonds carries with it dividends which are earned and declared after testator's death.

6. SALE TO PAY DEBTS. *Abatement of legacies. Code* 1892, §§ 1881, 1893.

Under Code 1892, § 1881, providing that the lands of a decedent shall stand chargeable for the debts and expenses over and above what the personal estate may be sufficient to pay; and § 1893, authorizing the executor to petition for the sale of the land of the decedent on discovering that the personal property will be insufficient to pay the debts and expenses—the personal estate must be exhausted before the land may be resorted to to pay debts, whether the decedent died testate or intestate, unless the will evidences a manifest intent to the contrary; and in case it is necessary to resort to specific legacies specific bequests must abate proportionately, even to the extent of complete destruction, before specific devises can be compelled to contribute to the payment of the debts.

7. ELECTION BY WIDOW. *Charges.*

Where a testator devised a plantation, charging the devisee with any indebtedness due on account of the unpaid purchase money thereon, and the widow elected to take against the will, the widow's interest in the plantation was free from any incumbrance on account of the unpaid purchase money, although her election was not indicated until after the assumption by the devisee of the burden of the devise.

8. ACCEPTANCE OF DEVISE.

One who accepts a devise charged with the payment of the unpaid purchase money on the property devised is not a purchaser for value, but occupies the·same position as other specific devisees and legatees.

9. ASSUMPTION OF DEBTS.

A devise of a plantation "with the distinct understanding that the said [devisee] is to pay and assume any and all indebtedness due by me on account of purchase money of said place" exonerates testator's personalty from its primary liability for such purchase money.

FROM the chancery court of Yazoo county.

HON. ROBERT B. MAYES, Chancellor.

Gordon and others, appellants, were complainants, and Mrs. James and others, appellees, were defendants in the court below, the bill being one filed by appellants as executors of the will of Daniel A. James, deceased, for a construction of said will and for instructions as to the apportionment of debts, distribution of assets, etc. The opinion of the court discloses all the material facts of the case.

*Noel, Pepper & Elmore,* for appellants.

Are specific devises and specific legacies subject to proportional abatement and debts?

At common law, land, whether devised or inherited, was received free from all charges of every kind, except debts of the specialty kind. The rule has nowhere been changed, so far as we know of, except by statute. *Evans* v. *Fisher,* 40 Miss., 665, 666; *Holman* v. *Bennett,* 44 Miss., 322, 326.

86 Miss.—46

Legacies are not chargeable on lands unless such an intent appears in the will. *Knotts* v. *Bailey,* 54 Miss., 235; *Perkins* v. *Bank,* 33 South. Rep., 18; *Carroll* v. *Botsak,* 65 Miss., 350; *Cady* v. *Cady,* 67 Miss., 425; *Brill* v. *Wright,* 8 Am. St. Rep., 717.

In the last case above mentioned the authorities are very fully reviewed on this point.

While there are two sides to this question, as to ratable abatement of specific devises and legacies, and the 19 Am. & Eng. Ency, Law announces (p. 1316) that the minority only gives specific devises superior standing, yet this is almost, if not entirely, a question of statutory construction, and our statute leaves really no question open as to making realty secondarily liable. Whatever modification of the common law rule exists in this state is made by Code 1892, § 1881.

It will be noted that the above section, even when taken in connection with sec. 2543, does nothing more than make rents part of the assets of a decedent's estate of the same class with all of the other personalty, regardless of whether the decedent died testate or intestate and of whether the particular personalty happened to be a specific or residuary legacy or unaffected by the will. The mere fact of such property being originally assets, or made so by the statute, does not in the least affect the rights of others than creditors to such property, nor the subordination of such rights. No suggestion of such purpose is contained in the statute, whose sole purpose, besides adding rents to the column of personalty, seems to be to make land a secondary resort for creditors and the expenses of administration. See *Hull* v. *Hull,* 3 Rich. Eq., 65, recognized in *Farmer* v. *Spell,* 11 *Id.,* 549; *McFadden* v. *Hefley,* 13 Am. St. Rep., 678, 680; *Gooch's Ex'r* v. *Gooch's Adm'r,* 1 Am. St. Rep., 161.

This line of decisions embodies correct principles and follows true legal analogies, and is in full accord with our own decisions. Some courts and text writers have held that the

claims of the specific legatee are as much in the mind of the
testator as the claims of the heir of specific devisee, but this
court, looking back to the common law as our source of light,
undimmed except by clear, contrary statutory regulations, has
uniformly declared otherwise. *Perkins* v. *First Nat. Bank of
Yazoo City,* 38 South. Rep., 18 (19 Am. & Eng. Ency. Law
[2d ed.], 1354); *McCampbell* v. *McCampbell,* 15 Am.
Dec., 59.

The doctrine that the commingling of realty and personalty
in the residuary clause of a will as a fund for the payment of
legacies or debts puts the whole fund on a common footing, is
not in violation of the rule here maintained, but constitutes a
testamentary alteration in the usual legal status, as does a
legacy by a person who has nothing but realty from which it
could be paid, the one appearing on the face of the will and
the other in the application of the testamentary design to the
subject-matter.

To the ordinary rule of the parity of devises and legacies of
the same class, whether general, specific, demonstrative, or
residuary, there is an important exception, based upon sound
reason. Devises and legacies are ordinarily pure gifts, matters
of gratuity, supported by no valuable consideration. When a
valuable consideration enters into the transfer of property, even
through a will, some of the distinguishing features of wills are
altered. For instance, it is a general saying that the distin-
guishing feature of a will is its ambulatory character, being
subject to revocation until the death of the testator; yet a de-
vise based upon a valuable consideration may make a will
irrevocable or an obligation to devise to be held superior, in
right, to a devise or bequest. Schouler on Wills, 484; *Anding*
v. *Davis,* 38 Miss., 594; *Sharkey* v. *McDermott,* 91 Mo., 647;
*Byrd* v. *Pope,* 73 Mich., 483; *Carmichael* v. *Carmichael,* 72
Mich., 76; Roper on Legacies, 431; Williams on Executors,
1365; 2 Redfield on Wills, 551; *Brill* v. *Wright,* 8 Am. St.

Rep., in note p. 725.; Schouler on Wills, 488; *Knott* v. *Bailey,* 54 Miss., 238.

The principles and authorities invoked, applied to the present case, establish the following propositions:

(*a*) That the three plantations, including Stonewall, cannot be resorted to ·at all for either debts or legacies of any kind until all of the personalty, constituted as assets by statute, are consumed.

(*b*) That the Stonewall plantation, being received by T. W. James upon the express condition that he would pay or assume the purchase money due thereon by testator, constituted him, as against all others, except creditors, a purchaser for value, and protected that plantation against any diminution or abatement for debts or legacies until all the other property was exhausted.

The court recognized this doctrine to the extent of requiring the unpaid purchase money to be deducted from the value of Stonewall before any abatement could be had. As between T. W. James, who had been subrogated to the rights of purchase-money lien holder, and other creditors of testator, this rule would be correct, but as between T. W. James and the other devisees or legatees, who paid nothing, and were the mere recipients of bounty, a different rule should apply. It is the quality, and not the quantity, of consideration which upholds obligations of all kind, as against volunteers. T. W. James, as devisee, was under no liability for the unpaid purchase money until he accepted the devise and assumed the debt. Then he became personally responsible, regardless of whether, under extraordinary circumstances, the land devised would or would not pay the debt against it, and the liability became unqualified and related back to the death of the testator. 18 Am. & Eng. Ency. Law (2d ed.), 746; 1 Am. & Eng. Ency. Law (2d ed.), 46; *Blower* v. *Morett* (N. C.), 2 Ves., 422.

Legacies based upon consideration are entitled to priority over those which are mere bounties, even though greatly in

excess of the consideration. 1 Am. & Eng. Ency. Law (2d ed.), 48, 50.

Rents and growing crops go with the land, if not needed for payment of debts.

The authorities we have cited show that, at common law, growing crops and accruing rents go to the heir or devisee. Statutes in derogation of this common law principle are to be strictly construed, at least not extended further than clear intent. The only intentions manifested by the statutes in making growing crops and accruing rents assets are those which, for the purpose. of settling the obligations of the estate, give the executor or administrator the same power of disposition as in other personalty. But for these statutes, rents and crops would have been beyond the reach of all creditors, except those by specialty. Our statutes, as to growing crops, leave it with the executor or administrator to determine whether they shall be taken charge of or left to go with the land, and allow rental of lands only for the purpose of paying debts. Secs. 1882 and 1883 of the code. Surely the law does not leave it to the executor or the administrator to control the ultimate disposition of growing crops or accruing rents further than to constitute them, when necessary, a part of the fund for payment of debts. If not needed for debts, the proceeds of growing crops and of accruing rents should go to the heir or devisee of the land from which they were diverted, subject to such abatement as might be incident to other personalty specifically devised, the specific devise of land carrying with it, except as against creditors or expenses of administration, the growing crops. Most of the crops on Stonewall were grown by share hands, the landowner's half maturing as the crops were gathered and cotton made ready for market. The seventy-eight bales of cotton gathered by T. W. James, after he took charge of Stonewall, was to the extent of one-half, the half going to the landowner, subject to abatement, like other specific legacies.

Especially is this true when the provision of item 2 of the will in controversy is considered, providing, as it does, that if the testator dies before the first day of January, 1901, the rents should go to executors, showing an intention—and the intent absolutely controls construction of wills—that if he died after January 1, 1901, the rents were not to go to the executors, but·to the devisee. Changed as the will was, in many respects, by the numerous codicils, this provision was not altered. No such provision is made with reference to any of the other plantations nor as to the increment·of any property.

According to the decree appealed from, the dividends on stock go to the specific legatees entitled to the stock, and the increment of the land goes with the residuary estate to the creditors. The increment of realty is taken from the devisee, while the increment of personalty is given to the legatee, thus putting a specific devisee in a lower scale than a specific legatee. We feel sure that no authority could be found in common law states, with statutes like ours, upholding this subordination of devises to legacies. It is a reversal of fundamental principles of the distribution of estates.

Does renunciation of will entitle the widow to partition in kind?

The answer to this query involves a construction of secs. 4496 and 4499 of the code, which are to be considered together, the latter applying to renunciation where the widow owns some property, thereby necessitating an appraisement. The appraisement showed Mrs. Carrie James owned, in her own right, $5,000 of property, which was less than one-fifth of what she would have inherited had there been no will. Consequently the $5,000 is not to be deducted. But this does not alter the effect of the appraisement. Section 4499 clearly indicates that the widow receives, when there is but one child, one-half of the husband's estate, less what may be deducted on account of her own property, her claim against her husband's estate constituting, in effect, an indebtedness against that estate to the ex-

tent of one-half, chargeable, primarily, like other debts, upon personalty; and, secondarily, upon realty.

Even if this construction be not correct, then when the widow exercises her choice of renunciation, her election, avoiding the devises to her, should cause what would have gone to her, to be applied toward making good the deficiency in whatever legacy or devise had the highest standing, which, in this case, would undoubtedly be the devise of the Stonewall plantation to T. W. James. *Latta* v. *Brown,* 31 L. R. A., 842.

*Barnett & Perrin,* on the same side.

The whole question involved herein is one of marshaling assets; and the very object of marshaling, and the reason that a court of equity resorts to such a scheme, is to enable all parties having equities in different funds or estates to receive their due proportions, notwithstanding any intervening claims of particular persons to prior satisfaction of a portion of these funds. Story's Eq., 570.

The devisees and legatees, as far as the rule is concerned, stand upon an equal footing. Each one is an object of the testator's bounty. It was in his power, if he so desired, to exempt any one or any class altogether from the payment of debts, and this would have put them on a different basis. That he has not done; so it would seem evident, so far as the testator was concerned, that all come in the same class. In making the decree in the case, the chancellor, in determining the order in which the different classes of assets should be appropriated and administered, so as to secure the equitable rights of all claimants, creditors, legatees, or devisees, adopted the rules laid down by Pomeroy in his work on Equity Jurisprudence in note to sec. 1135 (2d ed.), which are as follows:

"The order in which the different classes of assets are to be appropriated and administered, so as to secure, if possible, the equitable rights of all claimants, creditors, and volunteers, is the following:

"1. The general personal property not disposed of at all by the will, or only disposed of by being included in the residuary clause.

"2. Real estate expressly devised to be sold for the payment of debts, and not merely charged with the payment of debts.

"3. Real estate descending to the heir, and not charged with debts.

"4. Real estate devised and personal property specifically bequeathed charged with the payment of debts—that is, specifically given to devisees or legatees subject to the payment of debts.

"5. General pecuniary legacies, or, to speak more accurately, the personal property which would otherwise be needed to pay the general legacies.

"6. Real estate devised, not charged with debts, including real estate embraced in a residuary devise, since every devise of land is essentially specific, and personal property specifically bequeathed—that is, articles or funds given as specific legacies. These kinds of property, being specifically given, stand on the same footing, and they all contribute ratably with each other in case of a deficiency.

"7. Property which the testator appoints under a general power of appointment in favor of volunteers."

19 Am. & Eng. Ency. Law (2d ed.), 1300, *et seq.,* adopts the same order and quotes many authorities to sustain its position.

Counsel for T. W. James, who is attacking the decree along these lines, has, we think, lost sight of the fact that all of the estate, real and personal, is liable to creditors, but that no principle of equity or good conscience will compel parties in the same class, all equally the objects of the testator's bounty, to pay debts disproportionately. The intention of the testator is the "pole-star" in the construction of all wills, and if the testator had desired to put the devisees of the real estate in a favored class, how easy for him to have done so! He could have designated them as Class A or Class B and made one or

the other the special objects of his bounty. If it is possible, all must receive what the testator expected that they should receive; and if not possible, this expectation or intention must be carried out as nearly as possible. Would it be done by depriving the legatees of their bounty entirely and giving the devisees theirs in full, where such an intention can be found in the will? Is it not more reasonable to say that the legacies and devises, each being specific, are therefore in the same class, and hence should abate ratably? And this is the idea of Pomeroy, who says: "Specific legacies and devises stand upon the same footing, are subject to the same liability, are abated under the same circumstances, and contribute ratably for the payment of debts and charges." Pom. Eq. Jur., sec. 1137.

"It is the policy of our laws that both real and personal property are equally liable for the debts of decedents, and that realty devised and personalty bequeathed shall, where the devise and legacy are of the same character, abate ratably when there is a failure of assets undisposed of by the will to pay debts. It is in keeping with this policy that the rule by which specific legacies and specific devises are abated ratably by the necessities of contributions to the debts of the estate has come to be established. That specific devises and specific legacies abate *pro rata* when there is necessity for either to contribute to debts is a proposition sustained by the weight of authority and reason." *Richardson* v. *Kelly,* 13 South. Rep., 785.

The true meaning of the doctrine involved in this order of distribution should not be misapprehended. It is to be applied not to creditors, for, generally speaking, all classes of funds are subject to creditors; but it furnishes a rule by which the rights of claimants, as among themselves, are to be adjudicated in the final apportionment and distribution of the whole estate. It is the basic principle of marshaling.

The case of *Perkins* v. *First National Bank,* 33 South. Rep., 18, relied on by counsel for T. W. James, strikes us as being rather against the proposition for which he contends.

The general principle is announced in that case that, ordinarily, legacies are payable out of the personal estate, and yet the legacy in the Perkins case was not a specific one; but, nevertheless, it was ordered to be paid out of the land—or, rather, it was declared to be a charge on the land—and this, too, in the face of the fact that the general devisee in that case was the wife of the testator, while the legatee was only a servant. ·

Relative to the other cases relied on by counsel for T. W. James, notably *McFadden* v. *Hefley* and *McCampbell* v. *McCampbell,* 1 Am. & Eng. Ency. Law (2d ed.), 57, says: "In some instances, following cases decided upon the authority of *Cornewall* v. *Cornewall,* 12 Sim., 298, overruled in *Gervis* v. *Gervis,* 14 Sim., 654, it has been held that specific legacies abate before specific devises, and the devisees cannot be called upon for contribution, unless the testator has manifested his intention to place both on the same level by charging the land, or it is subject to a lien, and all the cases relied on by counsel for the appellant are referred to." Mr. Pomeroy also calls attention to this minority in his note to sec. 1135, but winds up with the statement that "the great weight of authority supports the rule as given above"—viz., that specific legacies and devises abate ratably.

Is T. W. James a purchaser for value of Stonewall plantation?

We do not deny the proposition that where there is a valuable consideration for a bequest or devise it has priority over those legacies which are mere bounties, but we do deny that there is any such consideration in the devise to T. W. James. There was no legal obligation upon T. W. James, either before or after the death of D. A. James, to accept the land devised to him. He could have refused to accept the devise with the proviso therein, and no power on earth could have compelled him to do so; but, having accepted it as a bounty, and upon the terms imposed, it ill becomes him to claim that he is a purchaser for value. Moreover, it is universally held that

to constitute a valuable consideration for a bequest or devise under a will there must be the surrender of existing rights or interests, and these rights or interests should be existing at the time of the testator's death, and the illustrations usually given are to a creditor in satisfaction of a debt, to a wife in lieu of dower, and similar cases. In order to bring T. W. James in this class it would have to appear that, prior to D. A. James' death, he had assumed the indebtedness on the Stonewall place, relieving D. A. James altogether of its payment, and in consideration of this assumption the devise had been made; but there is no such claim in this case, and the devise, if accepted, must be taken *cum onere*. We do not think it necessary to quote authorities on this, but should the court desire to refer to them, a number will be found in 1 Am. & Eng. Ency. Law (2d ed.), 51.

What was the effect of the renunciation by the widow of the provision made for her in the will?

We believe that every state in the union which has abolished dower has a provision similar in import to the section of our code which allows a widow to renounce her husband's will, and those states which still have dower give the widow the right to take her dower interest in lieu of any provision made for her in her husband's will. Notwithstanding these facts, we have been unable to find a case dealing directly with the effect, as regards the distribution of an estate, where a widow renounces the will of her husband and elects to take her legal share in lieu thereof. After a close study, it is our judgment that the only error in the decree of the chancellor is along this line.

Section 4496 of the code provides that when the provision made in the last. will and testament by a husband is unsatisfactory to the wife, she may at any time in six months after the probate of the same renounce the provision made for her, and in lieu thereof take her legal share of his estate, and that "thereupon she shall be entitled to such part of his estate, real

and personal, as she would have been entitled to if he had died intestate." It is a maxim of law that every man is presumed to have known that, as to the legal share of his estate to which his wife was entitled, he could make no valid disposition by will, so far as she was concerned; and an invalid disposition by will is the same as no disposition at all. This being true, and there being but one child, and the wife having renounced the will, we lay it down as a proposition of law that, as to one-half of his estate, real and personal, D. A. James died intestate. One fact is evident: the renunciation by the widow can have no effect as to the legal disposition made of the other moiety of the estate by the testator. In this instance, having attempted to dispose of his whole estate, the renunciation, *ipso facto,* had the effect of reducing each legacy and each devise one-half. Could it have a greater effect than that? The presumption that every one knows the law applies as well to the widow as to the testator, and if it is true that upon her renunciation her legal portion would go to her as if the testator had died intestate, then it must be true that, in a legal sense, the real estate, if she takes in kind, descends to her, and as to the personal property to which the widow is entitled after renunciation, if she takes in kind, it is as if no disposition had been made thereof under the will; in other words, as to this part of the property, the testator died intestate. Now, if there is any one principle with regard to the distribution of an estate which is universally recognized, and has never been challenged, it is that principle which declares that "property undisposed of by will is primarily liable for the payment of debts in preference to that which is expressly bequeathed or devised." Pom. Eq. Jur., sec. 1135. And this principle, taken in connection with that other principle which seems equally well established— viz., that real estate which descends (and this can mean nothing more nor less than real estate which is not devised) is liable for the payment of debts before specific legacies or specific devises can be called on to contribute—we say that if these

two principles are recognized as true, but one conclusion can be drawn therefrom, and that is that this portion of the estate, undevised and not bequeathed, which the widow has elected to take in lieu of the provision made for her in her husband's will, is first liable for the debts before the specific legacies and specific devises can be called on to contribute. What was the object of giving the widow six months in which to make her election, if it was not to give her an opportunity to inform herself as to the value of the estate, the amount of its liability, etc., so that she could make her election intelligently?

The chancellor recognized the above principles in the decree when he ordered that the legacies and bequests made to the widow, and which she renounced, should first be exhausted in the payment of debts before the specific legacies and devises should be called upon to contribute, and he was right, because as to those legacies and devises the testator died intestate; but the chancellor should have been consistent and declared that as to the moiety which the widow was claiming the testator was also intestate, and should have applied the same rule. Under no circumstance can it be said that the testator bequeathed or devised to his widow one-half of his estate, but she obtained it for the very reason that it was not devised—or, rather, was not properly devised; and as to that moiety, he died intestate.

It will be observed that the provision made by the husband in his will must be satisfactory to the widow; no one else is to be consulted about it. Regardless of what provision he makes for her, she can declare it unsatisfactory and renounce the will. Suppose, under his will, a husband should leave his wife property valued at more than her legal portion of his estate, and yet make provision for other parties. which does not meet the approval of the wife, and the latter should renounce the will; and suppose, further, that sufficient provision had been made for the payment of the testator's debts. How would the estate be divided? Would the court decree that the wife

was a tenant in common with the other legatees of the property given them under the will and thus defeat the intention of the testator? And, if so, what would become of the portion of the estate bequeathed to the widow? If it is to be divided in kind, and not in value, this would seem to be the result. But if we go back to the cardinal rule of construction of a will—namely, that the intention of the testator shall prevail as far as possible—we can obviate this difficulty. In the extreme case mentioned above, the legatees would receive their legacies and the widow would receive her share of the estate in value, and not in kind. In the case at bar, to carry out the intention of the testator as far as possible, letting the presumption prevail that the testator knew the law and that he could not legally bequeath or devise more than a moiety of his estate, his intention, then, would be carried out by giving the specific legatees and devisees at least one-half of their bounties. There are some rights of the testator which even the widow who renounces the will of her husband must respect. If he die intestate, she would be entitled to exempt property belonging to her husband under certain conditions; but this is not so where he makes a will and disposes of the exempt property. Upon renunciation "she will not be entitled to specific property of this description [exempt] which is disposed of by the will." *Nash* v. *Young,* 31 Miss., 134.

A homestead can be disposed of by will; the wife upon renunciation is not entitled to the same, but only to her distributive share. *Kelly* v. *Alfred,* 65 Miss., 495.

We quote a few authorities on the principle we have last contended for:

"The heir is not entitled to contribution from the devisee toward the satisfaction of creditors." *Livingston* v. *Livingston,* 3 John. Ch., 157; *Livingston* v. *Newkirk,* 3 John. Ch., 312.

Where lands have descended and others have been devised, the former are first liable to the discharge of debts or an an-

nuity which, by the will, is charged upon the whole estate.
*Mitchell* v. *Mitchell,* 21 Md., 255.

The widow is an heir of her deceased husband. *Hope* v.
*Hoover,* 21 South. Rep., 134.

Again, this statute should be strictly construed as far as its
legal effect is concerned; it being opposed, at least to the
extent of allowing the living spouse to renounce, to the other
statute, which allows every person of sound mind, etc., to make
disposition of his estate by will; and the statute has already
been strictly construed so far as the time in which the renuncia-
tion has to be made.

*Campbell & Campbell,* for appellees.

There is nothing in the contention that T. W. James was a
purchaser for value of the Stonewall plantation by reason of
his payment of the mortgage on the place, as required by will,
and therefore he occupies a more favorable position than all
the other parties interested, and can require them to make up
the deficiency in the payment of debts before he can be required
to contribute. If he had paid off the mortgage, pursuant to an
agreement with his brother, D. A. James, in his lifetime, and
D. A. James had then devised him the Stonewall plantation,
there would be some merit in the contention; but T. W. James
was under no obligations whatever to pay off this mortgage,
and if he did so, he was a mere volunteer, and took the prop-
erty *cum onere,* and cannot call on any other portion of the
estate for relief. 2 Brown Chancery Cases, 257,. cited with
approval in *Hays* v. *Jackson,* 6 Mass., 154. This case is ex-
actly in point.

The other proposition advanced by counsel for T. W. James
as to the rents of 1900, under the terms of the will of D. A.
James, is, we think, illegal, as the will alone deals with the
rents of 1900, and no other year; but a complete answer to his
contention is sec. 1881 of the code, providing that the rent
of the lands during the year of the death of the decedent,

whether he died testate or intestate, shall be assets chargeable with the debts.

- The proposition that, by reason of sec. 4499 of the code, the widow when she renounces the will takes the value of her share of the property, and not in kind, is equally untenable. Section 4499, if capable at all of the attempted construction, is not applicable in this case, as by its very terms it applies only where the value of the separate property exceeds one-fifth of the portion which the wife would get by renunciation of the will. The record admits that the separate estate of Mrs. Carrie James was less than a fifth of the portion she would receive of her husband's estate by renunciation of the will. The separate property consisted of one-half interest in two policies of $5,000, in which her name appeared as one of the beneficiaries. Section 4499 does not apply, but sec. 4496 alone applies, which unquestionably gives her her share in kind and makes her a tenant in common with the other devisees and legatees.

It is contended that the widow occupied the position of an heir, receiving descended property not devised in the will, and therefore her share was primarily liable for debts before legacies and devises could be reached; but the mere statement of the proposition carries with it its own refutation. It is begging the point to assume that the testator dies partially intestate; for, as a matter of fact, he included in his will every particle of property which he owned. The property which the wife received upon renunciation of the will is taken by virtue of the terms of the statute, and not cast upon her by descent. Again, the statute says that she shall receive such share of her husband's property as if he had died intestate, not partially intestate. The rule of law, that descended property be first applied to the payment of debts, applies only in case of partial intestacy. To put such a construction upon the statute would defeat the very purpose for which it was enacted, which was to prevent either the husband or the wife from disinheriting the

other. If by renunciation of the will the portion received by such renunciation is rendered primarily liable for payment of the debts of the decedent, then to defeat the purpose of the statute would be most easy by creating debts to the value of the share that would be received by renunciation. To put such a construction upon the statute would be flagrant judicial legislation and tantamount to reading in the statute, in line 8, sec. 3496 of the code, the words "partial intestate," instead of "intestate." The case of *Nash* v. *Young,* 31 Miss., 134, and the case of *Kelly* v. *Alfred,* 55 Miss., 495, did not support contention of counsel. The cases of *Nash* v. *Young* and *Kelly* v. *Alfred* simply decided that because the statute says that the exempt property shall descend to the wife or husband, when there are no children, this did not prevent a testamentary disposition of said property, and that upon renunciation of the will the party so renouncing took only his or her share in the exempt property, and not the entire property; and in the case of *Kelly* v. *Alfred, supra,* Judge Arnold says that the only remedy of the husband and wife is a renunciation. The provision of the code could afford no remedy at all if the husband or wife could saddle all of his or her debts on the distasteful member of the matrimonial partnership, if such member should dare renounce the will.

The attempted application of the principle is a perversion of it. It is an equitable doctrine intended for the protection of the legatee. *Hope* v. *Wilkerson,* 52 Am. St. Rep., 149.

An equitable principle intended as a shield to the legatee is attempted to be made a sword to destroy or impair the rights of a widow renouncing an unsatisfactory will of her husband—a thing we feel confident that this court will not do, especially as it will be establishing a most doubtful precedent for future cases.

Argued orally by *E. F. Noel,* for appellants.

TRULY, J., delivered the opinion of the court.

This is a proceeding instituted by appellants, as executors of the last will and testament of D. A. James, seeking a construction of that instrument, and asking instructions from the chancery court as to the proper method to be adopted in distributing the assets of the estate. All devisees and legatees and other parties in interest were cited and duly appeared as parties defendant.

The facts which rendered the action of the executors advisable and seemingly necessary are these: D. A. James, the testator, died on the 14th day of December, 1903, leaving a last will and testament, in which the appellants herein were nominated as executors. James left surviving him a widow and an only child, an infant of tender years, born since the date of the execution of the testament, but dealt with and provided for in a codicil thereto. At the date of his death the testator was seized and possessed of a large estate, consisting of three valuable plantations stocked with farming implements and work stock, one or more houses and lots, about fifteen hundred bales of cotton, a large amount of insurance on his life, stock in several banks and in many other enterprises, interests in mercantile establishments, jewelry, and other personalty. All of his property, without exception, was dealt with by the will, there being a general residuary clause. Most of it, and all of the more valuable portion, was either specifically devised or the subject of specific or demonstrative legacies. The will, executed over three years before the death of the testator, made no adequate provision for the payment of debts. Hence in entering upon the administration of the estate it was evident to the executors that the property not specifically devised or bequeathed would be insufficient to pay in full the debts due by the testator. The widow, being dissatisfied with the provision made in her favor by the will, in due time, and in the manner pointed out by the statute, filed her formal renunciation of the will, and demanded the allotment of the portion granted her by

the law.  The agreed statement of facts admits that the separate
estate of the widow did not amount in value to one-fifth of what
she would lawfully have been entitled to; and as there was only
one child, she claimed to be entitled to a one-half interest in the
real and personal estate of her deceased husband.  Upon final
hearing the chancellor rendered a decree giving specific direc-
tions with regard to the distribution of the estate.  Some of
the provisions of the decree are not excepted to, and we will
recite only such portions as are directly challenged by this ap-
peal, and shall deal with them not in the order of their presen-
tation, but according to the magnitude of the property interests
and the importance of the legal principle involved.

The first ground of error which we shall consider arises from
the second paragraph of the decree, which is as follows:

"Second—It appearing that Mrs. Carrie W. James, the
widow of said D. A. James, deceased, had renounced the pro-
visions made for her under said will, and that the separate
estate of said Carrie W. James was less than one-fifth of what
her legal portion of the estate of said D. A. James, deceased,
would amount to, it is ordered, adjudged, and decreed that
the said Carrie W. James be and she is entitled to receive one-
half of said estate after the payment of the debts and costs
aforesaid, and said executors be, and they are hereby, ordered
to turn the same over to said Carrie W. James in kind so far
as the same can be done."

The facts disclosed by the record upon which this portion of
the decree is based are uncontradicted.  The widow, in pur-
suance of the provisions of Code 1892, § 4496, within six
months of the probating of the will, filed her renunciation
thereof in the form indicated by the statute.  It is admitted
that the entire separate estate owned by the widow—which con-
sisted exclusively of portions of the proceeds of certain insur-
ance policies upon the life of her husband, taken out by him for
her benefit, and collected by her after his death, and therefore,
under the decision of this court in *Osburn* v. *Sims,* 62 Miss.,

429, constituting a portion of her separate property—amounted in value to less than one-fifth of what she would be entitled to by law in her husband's estate. It is conceded that D. A. James had only one child, and therefore the widow's lawful portion of her husband's property would be one-half of the real and personal estate. It is contended by counsel for appellants that, inasmuch as the widow in this case renounced the provision made for her by the will of her husband, by operation of law her share of the property descends to her as heir, and coupled with all the burdens imposed by law as if her husband had died intestate as to this portion, and that the one-half of the estate as to which the decedent died intestate is first liable to all the debts of the decedent, by operation of the general principle of law which renders property undisposed of by will, and which descends to the heir in cases of partial intestacy, primarily subject to sale for the satisfaction of the debts of the decedent before any of the property which has been disposed of by the testator can be devoted to that purpose. The argument is perfectly sound, but the existence of the premises is erroneously assumed. Section 4496 does not say, upon the renunciation of the will by the widow the decedent becomes "partially intestate," or "intestate as to a portion of his estate," but expressly recites that upon the filing of such renunciation the widow "shall be entitled to such part of his estate, real and personal, as she would have been entitled to if he had died intestate." If the decedent had died intestate in the instant case—and by operation of the statute quoted so he did, so far as regards the rights of his widow—the widow would have been entitled to one-half of his real and personal estate under certain well-understood conditions and limitations. And they are not difficult of understanding. Upon the death of an intestate the estate, both real and personal, stands charged with the debts of the decedent—the personal estate primarily; secondarily, when the personalty is exhausted, the real estate. After the payment of debts, an heir's lawful portion of the

residue vests in the widow. This is the right of the appellee
in this case. The widow's lawful portion of the residue under
the facts of this record is an undivided one-half. To adopt
the argument of appellant, that by renouncing the provision
made in the will and demanding in lieu thereof her lawful
portion in the estate of her husband, thereby her share
became chargeable with all of the debts of the decedent, might
defeat the very end sought by the statute. In many instances,
especially where the decedent leaves several children surviving
him, the lawful portion of the widow in the estate would be
entirely consumed in the payment of the debts due by the de-
cedent, and thereby the widow either practically disinherited
by the inadequate provision of the will or absolutely so by
having her portion devoted to the satisfaction of the creditors.
Appellants endeavor to avoid the result of this consideration
by the observation that it is not compulsory upon the widow
to renounce the provision made for her, but that she is granted
six months after the probating of the will to investigate the con-
dition of the estate and decide advisedly whether she will
abide by the wish of her husband as expressed in his last will
and testament, or, renouncing that, place herself under the pro-
tection of the law. Counsel evidently overlooked the fact that,
while the renunciation is required to be made within six months
after the probating of the will, debts due by the testator are not
required to be registered or filed for probate until twelve
months after publication for creditors, so that it might often
be that an estate apparently solvent six months after the pro-
bate of the will would subsequently be shown to be deeply in-
volved, and thus the widow be left destitute through a mere
error of business judgment into which she had been entrapped
by a misleading appearance of solvency. But a far weightier
and more potential consideration is that the manifest intent
of the legislature, as gleaned from all the statutory enactments
bearing on this question, shows beyond peradventure that this
privilege of renunciation was granted the widow so that she

might be protected from possible injustice or misjudgment, and her proportionate interest in the residue of his estate not be at all dependent upon the whim or caprice of her husband. So Code 1892, § 4497, provides that, if the will of the husband or wife shall not make any provision for the other, the survivor shall have the right to share in the estate of the deceased husband or wife as in case of unsatisfactory provision in the will; and in such case a renunciation of the will shall not be necessary, but the rights of the survivor shall be as if the will had contained a provision that was unsatisfactory, and it had been renounced. In such case, if the argument of counsel for appellants were sound, by the simple device of omitting all mention of his wife in his will any husband, if financially involved, could effectually disinherit his wife, or force her lawful portion of his estate to assume the entire burden of his indebtedness. For this reason, there being no provision made for her, and no renunciation of the will under such circumstances being required (because the law does not demand the doing of an idle thing), when the wife made a demand for her lawful share, and it was allotted to her, it would be consumed in the payment of the debts, under the principle already adverted to—that it had not been dealt with, and was, therefore, liable to the debts of the decedent; thus bringing about, without the chance of escape or remedy by the disinherited wife, the very condition of affairs which the legislature wisely sought to prevent. We see nothing complex or involved in the beneficent legislative plan developed by the sections under review. It is this: The wife for whom in her husband's will an unsatisfactory provision is made, or for whom no provision is made, and who does not own separate property at the time of the death of her husband equal in value to what would be her lawful portion of her husband's real and personal estate, is at liberty to signify her dissent to the will; and when she has done this, in the eyes of the law the decedent, so far as her rights are concerned, becomes an intestate, and her rights are fixed by the law, which would

control if he had died in a state of total intestacy. Hence, after the debts are paid, she is entitled to her lawful portion in the residue of the estate, both real and personal, subject to the deduction which must be made therefrom if she owned, at the date of the death, any separate property exceeding in value one-fifth of her lawful portion in her husband's entire estate.

In the instant case, Mrs. Carrie W. James, by her act of renunciation, became entitled to a one-half interest in the real and personal estate of her deceased husband as if he had been an intestate. Therefore, when all of the debts of the estate have been fully paid, she will be entitled to her distributive share of one-half of all the residue of the personal property, and will become a co-tenant with each devisee, and own a half interest in each and every parcel of real estate specifically devised by her deceased husband. The contention that sec. 4499 of the code, by making use of the expression that the widow may signify her dissent to the will and "claim to have the deficiency made up to her, notwithstanding the will," intends to convey the meaning that this deficiency between the value of her separate estate and her lawful portion in her husband's estate has to be "made up to her" in money, and that to this extent she becomes, not a tenant in common of the property, but a creditor of the estate, is manifestly unsound. The contrary intention is plainly disclosed by the clause of the section immediately following, which announces the rule whereby the court shall be governed in proceeding to make up the deficiency. That rule provides that she is to have a certain proportion of her "lawful portion of the lands" and her "distributive share of the personalty," such interest being arrived at by a calculation based upon the relative value of her lawful portion of the estate as compared with the previously ascertained value of her own separate property. This is the interpretation which has been placed upon similar provisions in other states in the few cases which our research has disclosed. In *Doyle* v. *Doyle et al.* (Ohio), 34 N. E. 166, the view which

we have above announced, after full discussion, is approved, and the court in that case quotes from *Hartshorne* v. *Ross*, 2 Disn., 15, where it is said: "If he [the husband] died intestate, there is manifest propriety that she [the widow] should receive a liberal allowance; and should he devise his estate without providing as generously for his widow as did the statutes, she should have the option to abide by the will or take her portion at law. The election to receive less than her legal allowance should be hers. The husband executes his will subject to the law in force when it shall take effect, and therefore his devisees cannot complain. He might have cut off his heirs without any token of remembrance. Not so with his wife. Her right is paramount. It depends not upon his kindness, much less his caprice." And in *Gupton* v. *Gupton,* 3 Head, 490, speaking of a similar statute permitting renunciation of or dissent from the will, the court says: "It was intended to secure to her the election between the provision made for her by the will of her husband and the law of the land. It was intended that he should not have the power to deprive her of a just and proper share of an estate which she may have aided in building up. She has a right to stand upon the law and participate in his estate, whether he is willing or not. We will not defeat that right, and render this provision nugatory, unless we are compelled to do so." *In re Taylor's Will,* 55 Ill., 252; *Stokes* v. *O'Fallon, Ex'r,* 2 Mo., 32; *Arrington, Ex'r,* v. *Dortch, Ex'r,* 77 N. C., 367. We hold, therefore, that the decree of the chancellor was correct in deciding that appellee—Mrs. Carrie W. James, the widow—after the payment of all the debts of the estate, is a co-tenant of the lands of the estate, and also entitled to her lawful portion and distributive share—one-half of the residue of the personalty.

The extent of the widow's interest as fixed by law being ascertained, it is next necessary to determine to what property her right is by law affixed. An answer to this inquiry requires, first, an ascertainment of what will constitute the residue of the

estate of D. A. James. And this, in turn, necessitates a determination of the manner in which, under the law and the will of the testator, the different species of property and classes of legacies and devises forming the corpus of the estate are to be dealt with in the due administration of the estate, and the order in which they are to be applied to the payment of debts. And this brings us to the consideration of the next assignment of error. This assignment challenges the correctness of the propositions of law contained in the third and portions of the first and fifth paragraphs of the final decree herein. By the first paragraph the executors were directed in the payment of the debts and cost of administration of said estate to "first exhaust all moneys which have come into their hands as the proceeds of notes, accounts, or moneys due the said D. A. James, deceased, individually, or due Peter James & Co.; and if the proceeds from this source shall be insufficient to pay said debts and cost of administration, said executors shall next use the proceeds of all property not specifically bequeathed or devised, including all bequests or devises made to Carrie W. James, the widow of said D. A. James, deceased, who has renounced the provision made for her under said will, and including any rents or shares of crops for the year 1903 which have come into the executors' hands; and if the proceeds arising from the above two sources be insufficient to pay said debts and cost of administration, and it shall be necessary for the specific legacies and specific devises to abate, it is ordered that the said specific legacies and the said specific devises shall be abated proportionately to their actual value." The third paragraph of the decree recited "that the legatees who were left stocks or bonds upon which dividends have been paid to said executors are entitled to said dividends, to be distributed in accordance with the terms of this decree." And by the concluding clause of the fifth paragraph of the decree it was ordered that "the rents and shares of crops from said Stonewall plantation for the year 1903 shall go to the said executors as

assets of said estate, to be used in the payment of debts in the manner provided in the first paragraph of this decree." The soundness of the ruling of the chancellor embodied in the first paragraph above recited, which undertakes to fix the character of assets upon the crops and rents of the year 1903, especially those flowing from the Stonewall plantation, is first assailed. It is contended by the devisees that the rents and crops pass with the land to the specific devisee, and do not become assets in the hands of the executors. It is further urged by T. W. James, to whom the Stonewall plantation was specifically devised, that, regardless of the general rule, the rents remaining uncollected, and the growing crops which were on the plantation ungathered at the date of the death of the testator—amounting, as the record shows, to seventy-eight bales of cotton— passed absolutely with the devise of the plantation, for the reason that, by item 2 of the will, it is expressly recited that, "in case my death occurs before the first day of January, 1901, then and in that event the rents due from the said place for the year 1900 are to be paid to my executors." In this connection we may also consider the next assignment of error, based upon the alleged error of law in the ruling of the chancellor in the third paragraph of the decree directing the dividends collected by the executors on the stocks and bonds specifically bequeathed to be paid to the legatees and distributed according to the terms of the decree. It is urged that such dividends are properly assets of the estate, and should have been appropriated by the executors to the payment of debts of the testator. In passing upon the questions presented by the recitals of the decree now under review, it becomes necessary to determine what, under our law, constitute assets of a decedent. And this inquiry involves the necessity of an interpretation of the sections of the code applicable to the subject. Code 1892, § 1881, provides: "The goods, chattels, personal estate, choses in action, and money of the deceased, or which may have accrued to his estate after his death from the sale

of property, real or personal, or otherwise, and the rent of lands accruing during the year of his death, whether he died testate or intestate, shall be assets, and shall stand chargeable with all the just debts and funeral expenses of the deceased and the expenses of settling the estate." And in sec. 1882 it is further provided that "the court or chancellor may, on the application of an executor or administrator, decree the sale of the crop growing at the time of the death of the testator or intestate, upon such terms and in such manner as may be deemed best." Section 1892 gives the executor authority "to sell for cash the cotton raised on the farm of the deceased, or any other commodity raised for market, and to account for the proceeds thereof as assets." Regardless of the rule which might have formerly prevailed, or which may now control in jurisdictions in which there has been neither modification nor regulation by express statute, either as to the mode to be followed in the distribution of estates or as to what were formerly considered as assets, we now are governed by statutory provisions, and must first seek in them a definite and certain rule for our guidance. If the lawmaking power has spoken, the courts must obey, and confine themselves to a simple endeavor to effectuate the legislative intent as made manifest. Giving to the sections quoted their natural and usually accepted meaning, it is evident to our minds that the rents flowing from the lands of the testator accruing during the year of his death and the crops remaining on the lands at the date of his death, whether gathered or still in the field, matured or unmatured, are alike considered assets of the decedent, whether testate or intestate, and as such pass into the hands of his legal representative, and constitute a portion of the primary fund which is liable for the payment of the debts of the decedent and the expenses of the administration of the estate. In the instant case we are of the opinion that the rents and the growing crops on all of the lands of the testator are to be considered as assets, and dealt with accordingly. Nor do we think any intention on the

part of the testator to make a difference with reference to the rents or growing crops upon the Stonewall plantation definitely appears from the item quoted. The expression in that item referred solely and specially to the year 1900, and was only to control in the event of a certain contingency—namely, the death of the testator before January 1, 1901. What special reason the testator had for this provision nowhere distinctly appears. But probably, in view of the season of the year in which the will was executed, after the crops had all been planted and were then growing, and the expenses of the year's planting operations already in a large measure incurred, it was inserted to prevent the possibility of a dispute or misunderstanding over the rents and crops for that year between his devisees and his executors. But, whatever the purpose, that expression was restricted in its application to the year 1900, and dependent for its operation upon the happening of an event which never in fact transpired. After the end of the year 1900, the will being silent, the statute law applied as well to the rents and crops grown upon the Stonewall plantation as to the other lands of the testator. Nothing short of the positive, unequivocal expression of the testator can avoid the application of the statute. There is no such expression in this will. We hold, therefore, that the chancellor was correct in ordering the rents and crops, including the seventy-eight bales of cotton gathered after the death of the testator upon the Stonewall plantation, to be delivered to the executors as assets of the estate. We also uphold, as announcing the true rule, the third paragraph of the decree, directing the dividends upon the stocks and bonds to be delivered to the specific legatees. This provision must, of course, under the facts of the instant case, have read into it the modifications that, first, these and all other specific legacies must suffer proportionate abatement, if necessary, as hereinafter indicated, and, second, that the widow is entitled to one-half the remainder of each specific legacy after the payment of debts; and this necessarily in-

cludes an equal proportional interest and share in the dividends. Of course, if any of the dividends had been earned and declared, but simply remained unpaid, prior to the death of the testator, they would have passed to the executors as assets of the estate. But we do not understand that the decree in this regard contravenes the rule announced, the inference being, from the language employed, that the dividends were not declared or fully earned until after the death of the testator. In such state of case the rule is clearly and concisely stated in 1 Underhill on Law of Wills, sec. 409: "A specific legacy of securities—as of shares, notes, or bonds—carries with it all accessions to it, or incidents of it, which have been created prior to the death of the testator. . . . The specific legatee of shares of stock is entitled to all dividends which have accrued down to the death of the testator, as well as to those which subsequently accrue." See, as sustaining the text, *In re Hodgman,* 140 N. Y., 428 (35 N. E., 660); *Bristow* v. *Bristow,* 5 Beav., 289. "A specific legacy is a gift, not only of the thing or fund itself, but of all its produce, from the time of the testator's death." *Barrington* v. *Tristram,* 6 Ves. Jr., 345, and note. A specific legacy is "a gift by will of a specific article or part of the testator's estate, which is identified and distinguished from all other things of the same kind, and which may be satisfied only by the delivery of the particular thing." Such legacies "carry any accessions that may accrue by way of increase or interest after the death of the testator." 18 Am. & Eng. Ency. Law, 714, and many citations. This being the generally approved rule, and not having been changed or modified by the express terms or plain intendment of the statute, we accept and adopt it as stated.

The next ruling of the chancellor, set forth in the concluding clause of the first paragraph of the decree above recited, assigned for error, is the requirement that, in the event the proceeds of all property not specifically devised or bequeathed should prove insufficient to pay the debts and costs of adminis-

tration, so that it should become necessary for the specific legacies or the specific devises, or both, to be abated, so that the debts should be paid in full, "the said specific legacies and said specific devises shall abate proportionately to their actual value." This presents for our consideration the question, never before expressly adjudicated by the courts of this state, whether a specific devise of land stands upon the same plane and is to be controlled by the same principle as a specific bequest of chattels. Again referring for our guidance to the statutory provision as contained in the code, we find there plain recognition of the general principle that the personal estate of the decedent is the fund to which creditors must first look for the satisfaction of their debts. The last clause of sec. 1881 provides: "The lands of the testator or intestate shall also stand chargeable for the debts and such expenses over and above what the personal estate may be sufficient to pay, and may be subjected thereto in the manner hereinafter directed." By sec. 1893 an executor is granted authority, when he shall discover that the personal property will not be sufficient to pay the debts and expenses, "to file a petition in the chancery court for the sale of the land of the deceased, or so much of it as may be necessary, and exhibit to the court a true account of the personal estate and debts due from the deceased, and the expenses and description of the land to be sold." And even then, after the insufficiency of the personal estate has become apparent to the executor, no valid final action can be taken on the petition until the heirs and devisees and all other parties in interest are duly cited to appear and contest, if they so desire. Upon the hearing it is only in the event the court is "satisfied that the personal estate is insufficient to pay the debts of the deceased, and that the lands ought to be sold for that purpose," that it is lawful to render a decree for a sale of a part or the whole of the lands. And in such case, where a portion of the lands has been sold, after a due observance of all the statutory requirements, "the heir or

devisee whose lands shall be sold may compel all others holding or claiming under such intestate or testator to contribute in proportion to their respective interest, so as to equalize the burden of the loss," thus recognizing the doctrine of forced contribution among devisees. The personal estate of the testator is first liable for sale for the payment of his debts. When the decedent dies intestate, it must be conceded that, except in special cases, provided for by sec. 1900, where the interests of all parties make it advisable, the entire personal estate must be exhausted before, even by recourse to the courts, any portion of the lands can be sold and the proceeds devoted to that purpose. The reason for this distinction between personalty and land is obvious, and is still recognized in our jurisprudence. The personalty upon the death of the owner passes to the administrator; the title to the land vests at once in his heir. If this be the rule and the order in which property must be applied to the liquidation of the debts of an intestate, we see nothing in the statute to warrant the conclusion that the legislature intended to adopt a different order in the case of a man dying testate. If the testator devise and bequeath by general terms his entire estate, unless the will contains evidence of a manifest intent on his part to commingle land and personalty, the personal estate must, as in case of intestacy, be first exhausted before any portion of the lands can be used. In the case of *Cady* v. *Cady,* 67 Miss., 425 (7 South. Rep., 216), speaking of pecuniary legacies which were chargeable upon the estate of the testator, this court, adverting to the diversity of opinion which exists in this and other instances where courts seek to discover the intention of the testator from the language he employs, and recognizing that the sole difficulty is in discovering that intent, which, when once ascertained, must be strictly followed, says: "Originally pecuniary legacies are payable by the executors, and out of the personal estate. The claim of the heir at law or of the devisee is ordinarily as much in the mind of the testator as that of the lega-

tee; and unless a contrary purpose appears from the will, it will be assumed that the testator intended that legacies should be paid only out of his personal estate, and upon that being insufficient, the legacies must abate in whole or in part." See *Knotts* v. *Bailey,* 54 Miss., 238 (28 Am. St. Rep., 348); *Heatherington* v. *Lewenberg,* 61 Miss., 376.

Is there any valid distinction on which to base a logical differentiation between a case of a general legacy not charged on the land and one where the entire estate is disposed of by specific legacies and specific devises? We can see no logical ground on which to base a distinction or a difference. In the case of a general legacy or bequest not charged on the realty, in an estate in which the land and personalty were not commingled by the testator, if necessary for the payment of debts, the general legacy would have to abate, even to the extent of obliteration, before any deduction could be made from the devise. And unless we expect to overrule and repeal by silently ignoring the provision of our statute which provides that no part of the landed estate shall be sold for the payment of debts except upon the insufficiency of the personal estate, we must adhere to the same rule. To uphold this portion of the decree of the chancellor, and to require in the instant case that the specific devises shall abate proportionately with the specific bequests, would be tantamount to ordering a sale of a portion of the land—not on account of the insufficiency of, but in order to protect, the personal estate from sale, because it is evident that every dollar which the devisees are required to pay in order to protect the lands specifically devised to them is simply the levying of a tribute upon the real estate before the personalty has been exhausted. This would be accomplishing by indirection that which the plain letter of the law forbids the court to do directly. If the executors filed a petition asking a decree for the sale of any portion of the lands, as a condition precedent to the lawful rendering of such decree it would be necessary for them to aver and show to the satisfaction of the

court that the personalty had either been exhausted or was
insufficient to pay the debts.   Yet in the instant case we are
asked to apply a portion of the value of the lands to the pay-
ment of the debts—not because there is no personalty out of
which the debts can be collected, but in order to protect and
preserve the personalty itself.   We announce our conclusion
on this point while duly mindful of the fact that the courts of
many jurisdictions have adopted a contrary view and require
a proportionate abatement of specific legacies and specific de-
vises as if they were all of the same class.   We are constrained
to adhere to what seems inescapably to be the manifest legis-
lative plan for the distribution of estates, leaving the wisdom
and justice of the scheme to the consideration of the legislative
department, which alone had authority to inaugurate it, and
is alone, in the absence of an expressed intent on the part of
the testator, vested with power to change or modify it.   We
are strengthened in our view by the consideration that in the
instant case, as to the widow, the decedent died wholly intes-
tate.   Her rights, therefore, are fixed by the letter of the law,
which requires the personal estate to be first exhausted before
any part of the land can be sold for the satisfaction of debts.
The widow is entitled to one-half the residue of the personalty.
That residue can only be known after all debts and costs of
administration have been paid.   Nor are her rights to, or the
extent of her interest in, the lands of the estate complicated
by any consideration of the legal rights of devisees and specific
legatees.   She is neither, but inherits as the forced heir of an
intestate.   As such, under no conceivable view of the law,
can she be forced to abate or reduce her share of, or interest in,
the lands.   If the decree undertakes to deal with her legal
rights, it is palpably violative of the statute.   If her interest
in the estate be exempted from its operation, the decree affords
no definite rule by which any computation of the rights of the
various parties can be accurately made, as it involves two con-

tradictory methods of raising money to liquidate the debts of the estate—one, the statutory method of devoting the personalty to that purpose; the other, requiring the devisees of the realty to contribute proportionately to that end.

In our judgment, the view we have indicated—that in every instance, save only when a contrary desire on the part of the testator is plainly evinced by his will, the personalty constitutes the primary fund for the payment of debts, and must be first exhausted—can alone preserve in its fullness and integrity the legislative scheme devised for the administration and distribution of estates, and at the same time harmonize with the previous adjudications of this court. Any other rule would result in endless confusion, wrought alone by the proportion which the debts of the testator might bear to the value of his estate. The will of the testator is the supreme law. That being silent, or not showing a contrary desire, the statute will control.

But aside from these deductions drawn from—and, in our opinion, warranted by—the language of our statutes, the conclusion we have reached—that the doctrine of forced contribution does not apply against specific devisees in favor of specific legatees (as by the statute it does among devisees), but that specific legacies must be first obliterated before specific devises can be abated—is not, as a general proposition of law, without the support of eminent authority. Says the court, in *Elliott v. Carter*, 9 Grat., 584: "That the devisee of real estate not charged with the payment of debts is entitled to have the assets marshaled against the claimants of the other funds of the estate in the order stated, including specific legatees, is well settled by the authorities. 2 Jarman on Wills, 601; *Clifton v. Burk*, 1 P. Wms., 678; *Forrester v. Leigh*, Amb. R., 171; *Scott v. Scott*, 1 Eden's R., 458; *Keeling v. Brown*, 5 Ves.; 359; *Mirehouse v. Scaife*, 2 Mylne & Craig, 695 (14 Eng. Ch. R., 696). . . . This exemption of real estate devised extends as well to the case of a deficiency of personal assets for the payment of legacies as of debts, the legatees having no

right to call upon the devisee to contribute to the payment of their legacies unless the real estate be expressly charged. *Hayes* v. *Leaver,* 2 Jarman on Wills, 547, note." In *Rogers* v. *Rogers,* 1 Paige, 188, it is said: "When the will of the testator contains no direction as to the payment of debts, chattels specifically bequeathed must be applied to the payment of a judgment against a testator before resort is had to the real estate devised." In a case where, as in the instant case, the payment of debts is charged by the testator, or by operation of law, upon the personalty, the order of application is thus stated: "The personal property at large is first to be applied to the payment of debts, and where legacies are to be used to pay debts, the first liable is the residuary legacy (2 Lomax on Executors, 126); and the next are the general pecuniary legacies; then, the specific legacies; and, lastly, the real estate devised by the will. *Edmunds, Adm'r,* v. *Scott,* 78 Va., 729." See, also, 19 Am. & Eng. Ency. Law, 1316, and citations; 4 Kent. Com., sec. 420, *et seq.;* 1 Story, Eq. Juris., sec. 577; *Shreve's Ex'r* v. *Shreve,* 10 N. J. Eq., 385; *Shaw* v. *McBride,* 56 N. C., 173; *Magruder* v. *Carroll,* 4 Md., 351; *Brill* v. *Wright,* 8 Am. St. Rep., 717, and note. We hold, therefore, that it was error in the chancellor to decree that the specific devises of lands should abate proportionately to their value in the same manner as specific legacies. The true rule is that upon an insufficiency of the personal estate, which is primarily liable to the debts, the specific bequests must abate proportionately, even to the extent of complete destruction, before the devisees, to whom lands have been specifically devised, can be called upon to contribute.

The conclusion reached upon these points renders consideration of other minor assignments of error unnecessary.

To prevent all possibility of misunderstanding upon a remand of this case, we recapitulate: The estate should be dealt with as follows: All of the assets in the hands of the executors,

including the proceeds of the rents of all the lands for the year 1903 and the seventy-eight bales of cotton gathered, after the death of the testator, on the Stonewall plantation, together with the other assets mentioned in the first paragraph of the decree of the chancellor, are to be devoted to the payment of the debts of the decedent and the expenses of the administration of the estate.    Should these be insufficient to a complete liquidation of all the debts of the estate, the specific legacies should abate proportionately, and in the event these be exhausted and there still remain any debts unpaid, the specific devises of land must contribute proportionately to the payment of the debts remaining.    After all debts have been fully paid, the widow, Mrs. Carrie W. James, will be entitled to receive one-half the residue of the personalty of the estate, and will be co-tenant to the extent of an undivided one-half interest in all the lands of the estate.    In ascertaining the interest of the widow in the Stonewall plantation, no account is to be taken of the unpaid . purchase money due thereon.    That debt constitutes no part of the indebtedness due by the D. A. James estate, having been by the express terms of the will affixed as a burden to the devise of T. W. James; and, having been by him assumed before the renunciation by the widow, Mrs. Carrie W. James is the owner of an undivided one-half interest in the Stonewall plantation, with work stock, farming implements, etc., thereon, free of any incumbrance by reason of the unpaid purchase money due thereon.    T. W. James, as to the Stonewall plantation, with the work stock, farming implements, etc., thereon, in no sense occupies the position of a purchaser for value.    The doctrine invoked applies only to cases where bequests or devises are made in lieu of lawful debts or demands which the recipient holds against the decedent and which he releases by reason thereof.    Pom. Eq. Jur., sec. 1142.    The language of the clause of the will carrying the devise clearly evinces the intention and desire of the testator that the specific devisee shall take *cum onere*.    This exonerates the

personalty from its primary liability. 1 Underhill, Law of Wills, sec. 384. T. W. James occupies no higher or better position than other specific devisees and legatees. All are alike mere recipients of the testator's bounty.

*Decree modified and cause remanded, to be proceeded with in accordance with the views herein expressed. Costs of this appeal to be taxed against the executors, appellants.*